*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

STRATA UNDERGROUND, LLC,

        Plaintiff-Appellee,

v

OYK INVESTMENTS, LLC, doing business as
OYK ENGINEERING AND CONSULTING,

        Defendant-Appellant,

and

OYK FIVE POINTS, LLC, FLAGSTAR BANK,
OYK ROCHESTER, LLC, LEVEL ONE
BANCORP, INC., JC BRICK, INC., FENDT
BUILDERS SUPPLY, INC., and J & G
CONTRACTORS, INC.,

        Defendants.

UNPUBLISHED
September 12, 2024

No. 365637
Oakland Circuit Court
LC Nos. 2022-193048-CB &
      2022-192997-CZ

Before: K. F. KELLY, P.J., and CAVANAGH and M. J. KELLY, JJ.

PER CURIAM.

In this breach of contract action, defendant OYK Investments, LLC, doing business as OYK Engineering and Consulting (OYK), appeals as of right from the trial court order (1) granting in part and denying in part its motion to vacate in part and confirm in part an arbitration award and (2) granting the cross-motion of plaintiff, Strata Underground, LLC (Strata), to confirm the arbitration award. For the reasons set forth in this opinion, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

## I. BASIC FACTS

This case arises from a protracted construction dispute between OYK and Strata that led to a contentious arbitration proceeding. OYK is a full-service engineering and construction company. Strata is a company that specializes in providing underground, excavation, concrete,

-1-

and site work for commercial real estate and municipal projects. At issue are two construction projects: the Trio Project and the Avant Project. OYK was the general contractor on both projects and Strata was a subcontractor.

As it relates to the Trio Project, Strata and OYK entered into five subcontractor agreements for a total contract amount of $1,095,000. On January 4, 2022, OYK terminated its subcontractor agreements with Strata. The parties agreed that as of August 30, 2021, OYK owed Strata $746,499 for the work it had performed in compliance with the five subcontractor agreements. Of this $746,499, OYK was entitled to retain $74,650, or 10%. However, OYK repeatedly changed the work that it asked Strata to do from that which was specified in the scope of work in the subcontractor agreements. While the extra work was documented as having been performed in the daily reports of both Strata and OYK, change orders were routinely issued by OYK in a delayed manner that hindered Strata's ability to recover payment. Five change orders were eventually issued reflecting that Strata performed $584,158 in change-order work. Even after the change orders were issued, OYK did not tender payment to Strata. Strata also claimed that the value of extra work that it performed was not incorporated into change orders, leaving it completely unable to recover for it. The arbitrator's review of daily reports from both OYK and Strata confirmed that the value of "verifiable additional work" was $43,438, not $116,000 as claimed by Strata. Additionally, the arbitrator found that when Strata ceased its work on the Trio Project, OYK owed Strata $68,973, which did not include its retention percentage under the five subcontractor agreements. After performing a reconciliation, the arbitrator determined that OYK owed Strata $51,725.01 with respect to the Trio Project.

As it relates to the Avant Project, Strata and OYK entered into a subcontractor agreement for a total contract amount of $1,025,000. While OYK initially overpaid Strata, this situation changed in November 2021, when OYK's payments to Strata resulted in a shortfall of $191,755. The arbitrator determined that as of October 31, 2021, OYK owed Strata $149,164.70. Strata suspended work on the Avant Project on November 19, 2021, because it had not been paid and OYK was "chronically behind" in tendering payments. The arbitrator determined that Strata's suspension was justified. The arbitrator also concluded that OYK wrongfully terminated the Avant Project contract, so Strata could "recover the profit it would have received had it been allowed to complete the work." The arbitrator calculated the damages due from OYK to Strata on the Avant Project to be $48,700.70.

In relation to the Trio Project, Strata filed a complaint in the circuit court, alleging that it had entered into several subcontractor agreements with OYK with regard to the Trio Project. After OYK continually failed to make payment for past due amounts, Strata ceased performing on November 19, 2021, and OYK wrongfully terminated the subcontractor agreements on January 4, 2022. Strata alleged breach of contract, sought damages in the amount of $388,982.25, and also sought foreclosure of its construction lien. Similarly, with respect to the Avant Project, Strata filed a complaint in the circuit court, alleging breach of contract because OYK's failure to pay the sums due under the terms of the parties' subcontractor agreement amounted to a material breach. Strata also alleged that it had incurred damages in the amount of $144,366.06 after OYK failed to make timely payment under the terms of its contract with Strata. In the alternative, Strata pleaded unjust enrichment, promissory estoppel, and quantum meruit, alleging that it had provided its services after relying on OYK's promises that it would be compensated.

The parties agreed to binding arbitration. After the arbitrator's decision was issued, the parties stipulated to reopen the litigation in the Avant case. OYK then filed a motion to vacate in part and confirm in part the arbitration award in both cases, which had been consolidated by the trial court. OYK contended that the arbitrator committed at least five separate errors of law that required reversal. Following a hearing on the cross-motions, the trial court confirmed the arbitrator's award, determining that the arbitrator had not exceeded his powers. OYK now appeals as of right.

## II. ARBITRATION AWARD

## A. STANDARD OF REVIEW

On appeal, as it did in the trial court, OYK raises several challenges to the arbitration award, asserting that the arbitrator exceeded his powers. The trial court's decision whether to vacate an arbitration award is reviewed de novo. *TSP Servs, Inc v Nat'l-Standard, LLC*, 329 Mich App 615, 619-620; 944 NW2d 148 (2019). This Court will not review an arbitrator's factual findings. *Kilpatrick v Lansing Community College*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 361300); slip op at 3, lv pending.

> On legal questions addressed by the arbitrator, this Court's review is not, strictly speaking, de novo, contrary to our review of a decision by a trial court or administrative agency. Instead, this Court looks to "whether the [arbitrator's] award rests upon an error of law of such materiality that it can be said the arbitrators exceeded their powers." *DAIIE v Gavin*, 416 Mich 407, 433; 331 NW2d 418 (1982) (cleaned up). This Court will not set aside an arbitration award unless the arbitrator committed legal error, "*and* that, but for such error, a *substantially different award* must have been made." *Id*. (cleaned up, emphasis added). [*Id*.]

B. ANALYSIS

Under MCL 691.1703(1), a party may file a motion seeking to vacate the arbitrator's award under several grounds, including that the "arbitrator exceeded the arbitrator's powers." Likewise, MCR 3.602(J) provides that "[o]n the motion of a party, the court shall vacate an [arbitration] award if . . . the arbitrator exceeded his or her powers." In addressing the appropriate standard of review to discern when an arbitrator exceeds its power under GCR 1963, 769.9(1)(c), a predecessor to the Uniform Arbitration Act, the Court in *Gavin*, 416 Mich at 434, explained that arbitrators exceed their power when they "act beyond the material terms of the contract from which they primarily draw their authority, or in contravention of controlling principles of law."

1. 10% RETAINAGE: TRIO PROJECT

OYK first argues that three of the subcontractor agreements for the Trio Project unambiguously indicate that the parties intended that OYK could withhold 10% retainage for all of the work that Strata performed, including work performed according to change orders. OYK points to Section 3 of the terms and conditions of the Underground Utilities and Grading subcontractor agreement, the Building B Foundation subcontractor agreement, and the Masonry Wall Footings and Foundation subcontractor agreement. In response, Strata argues that OYK could not withhold a retention percentage on completed change order work, because such work was not included in Exhibit A of each subcontractor agreement, which set forth the scope of work under each subcontractor agreement.

Resolution of this issue requires us to review the arbitrator's interpretation of a contractual provision. Unless there is ambiguity or an internal inconsistency, this Court's contractual interpretation begins and ends with the actual words of the agreement. *Co of Ingham v Mich Co Rd Comm Self-Ins Pool*, 508 Mich 461, 477; 975 NW2d 826 (2021). The primary responsibility of this Court is to effectuate the intention of the parties when they entered into the contract and, to honor that intention, this Court examines the language of the agreement according to its plain and ordinary meaning. *Id*.

Section 3 of the terms and conditions of the subcontractor agreements provides:

PAYMENT: THE GENERAL CONTRACTOR/OWNER will make monthly payments based upon completion of work in accordance with an agreed schedule of values or an agreed breakdown of estimated cost showing the value of labor, materials, and equipment, subject to and expressly conditioned upon payment thereof by General Contractor/Owner. *10% retention will be withheld by THE GENERAL CONTRACTOR/OWNER for all contracts until the time of 100% completion of the work performed in Exhibit A and held for an additional 90 days.* No progress payment made under this subcontract shall be conclusive evidence of the performance of this contract agreement either wholly or in part, and no payment shall be construed to be acceptance of defective work or improper materials. [Emphasis added.]

The arbitrator found that OYK could not withhold a 10% retainage because the work outlined in the change orders had been completed as set forth in Section 3 of the terms and conditions. Under Section 3 of each respective subcontractor agreement, the withholding of 10% applies only to work performed "in Exhibit A." Given that the work described in the change orders was not the same work referred to in Exhibit A of each respective subcontractor agreement, the arbitrator made a material error of law in holding that the reason that OYK could not recover was because the change order work had been completed. However, the arbitrator's ruling, while based on incorrect reasoning, ultimately reached the correct result. Accordingly, a substantially different award would not have been made in the absence of the arbitrator's error, and, as a result, this Court may not set aside the arbitration award. See *Kilpatrick*, ___ Mich App ___; slip op at 3.

## 2. STRATA'S RECOVERY OF LOST PROFITS: TRIO AND AVANT PROJECTS

OYK next argues that the arbitrator erred in concluding that Strata was able to recover its lost profits, and additionally, that its lost profits were calculated under an incorrect legal standard. We agree.

In Michigan, our courts follow the rule in *Hadley v Baxendale*, 9 Exch 341; 156 Eng Rep 145 (1854). In *Kewin v Massachusetts Mut Life Ins Co*, 409 Mich 401, 414-415; 295 NW2d 50 (1980), our Supreme Court quoted the rule from Hadley, stating, in pertinent part:

> [T]he damages recoverable for breach of contract are those that arise naturally from the breach or those that were in contemplation of the parties at the time the contract was made. 5 Corbin, Contracts, § 1007. Application of this principle in the commercial contract situation generally results in a limitation of damages to the monetary value of the contract had the breaching party fully performed under it.

The rule from *Hadley* limiting damages in the context of a commercial contract will not apply, however, if there is evidence that the parties did in fact contemplate such damages. *Kewin*, 409 Mich at 414. In *Lawrence v Will Darrah & Assoc, Inc*, 445 Mich 1, 12; 516 NW2d 43 (1994), our Supreme Court observed that Michigan precedent revealed a "flexible approach when determining the foreseeability of contract damages[,]" and for lost profits to be recoverable under *Hadley* and *Kewin*, the plaintiff must make a showing that the damages are such that they arise naturally from the breach of the contract, or that they can reasonably be said to have been in the parties' contemplation when they made the contract. This is an objective standard and ensures that the damages are such that the promisor was aware of them, or had reason to be aware of them, and the plaintiff must have submitted evidence regarding the element of foreseeability to establish a prima facie case for lost profits. *Id*. at 13, citing Calamari & Perillo, Contract (3d ed), § 14-5, p 595.

With respect to the Trio Project, the plain and unambiguous terms of the Building C Footings and Foundations subcontractor agreement confirms that the parties did not agree to Strata's recovery of consequential damages in the form of lost profits. Specifically, Section 20 of this subcontractor agreement, addressing claims and disputes, provides that in the event of a payment dispute between the parties, Strata is required to continue its performance under the subcontractor agreement, and that Strata "*hereby waives any right to consequential damages from [OYK] for any alleged breach, including, but not limited to, lost profits from other projects*." (Emphasis added.) Additionally, the subcontractor agreement for the Avant Project included a

provision in which the parties agreed that Strata would waive the right to recover consequential damages. These contractual provisions make clear that the parties did not agree that Strata would be able to recover lost profits when they entered into their agreements. Again, unambiguous contracts are enforced according to their plain and ordinary meaning. *Co of Ingham*, 500 Mich at 477. Therefore, the arbitrator erred as a matter of law by concluding that Strata could recover lost profits under the Trio Project's Building C Footings and Foundations subcontractor agreement and Avant Project subcontractor agreements and, but for this erroneous legal ruling, the arbitration award would have been substantially different, as the award in favor of Strata would have been significantly less because of the omission of its lost profits. *Gavin*, 416 Mich at 443, 445.

However, the Trio Project's Underground Utilities and Grading subcontractor agreement did not address the recovery of consequential damages. As a result, on the face of the arbitration award, there is no basis for this Court to conclude that the arbitrator made a clear legal error when he determined that Strata was entitled to lost profits on the Underground Utilities and Grading subcontractor agreement.

### 3. CALCULATION OF LOST PROFITS: TRIO PROJECT AND AVANT PROJECT

OYK next challenges the trial court's award of lost profits on the basis that they were awarded using an incorrect legal standard, as the arbitrator, giving Strata "the benefit of the doubt," awarded Strata 10% in lost profits under the Building C Footings and Underground Utilities and Foundations contract and the Avant Project subcontractor agreement.

To establish the element of damages for a breach-of-contract claim, the party seeking damages must prove them with a reasonable degree of certainty, as damages that are speculative or based on conjecture are not recoverable. *Van Buren Charter Twp v Visteon Corp*, 319 Mich App 538, 550-551; 904 NW2d 192 (2017). Under Michigan law, "expectancy" damages, such as lost profits, awarded for common-law breach of contract are intended to make the plaintiff whole following the breach. See, e.g., *Frank W Lynch & Co v Flex Technologies, Inc*, 463 Mich 578, 586 n 4; 624 NW2d 180 (2001).

While the arbitrator did not state in his December 9, 2022 opinion the basis for his ruling that Strata should be able to recover 10% in lost profits, for both projects he did indicate that he was not relying on the evidence of Strata's profit margins that had been earned or were being earned, stating that this evidence and Strata's expert on the subject, were not credible. Subsequently, in his May 31, 2023 opinion and order denying Strata's request for attorney fees, the arbitrator cited Section 18 of the Building C Footings and Foundations contract, which allows Strata to charge 10% for extra or changed work from the subcontract's original scope of work. This provision provides, in pertinent part:

> **Changes**: Without invalidating the Subcontract, Contractor may make written changes to the Work, including additions, deletions, or other revisions to the Work, with the Subcontract Sum and Subcontract Time adjusted accordingly. . . . *Adjustment to the Subcontract Sum for extra or changed work shall not be more than Subcontractor's actual cost to furnish the work, . . . plus a 10% markup for work performed directly by Subcontractor.* [Emphasis added.]

Section 18 of the Avant Project subcontractor agreement included identical language.

Section 18 does not yield support for the arbitrator's legal conclusion that Strata could recover 10% as lost profits as a matter of law. Instead, Section 18 is limited to a scenario in which Strata performed extra work, or work outside of the defined scope of work, which was not at issue here. Therefore, without any indication of how the arbitrator determined Strata's lost profits in compliance with Michigan law, or that these damages satisfied the benchmark of having to be both reasonable and certain, the arbitrator committed a clear error of law in his ruling with respect to both the award of lost profits and the calculation of these lost profits. If the arbitrator had not incorrectly awarded Strata its lost profits, the arbitrator's reconciliation of damages for the Avant Project would have weighed in favor of OYK. Therefore, but for this error, the arbitration award would have been substantially different. Accordingly, we reverse the trial court's order confirming the arbitrator's award of lost profits.

## 4. CHANGE ORDER WORK: TRIO PROJECT AND AVANT PROJECT

The arbitrator acknowledged in his award that Strata was asserting that the value of the extra work it had performed on the Trio Project that had not been included into written change orders was approximately $116,000. After reviewing in detail "the contemporaneous project records," including the daily reports of OYK and Strata," the arbitrator determined, as a factual matter, "that some but not all of the work referenced in the alleged additional work invoices was performed[,]" and the actual value of "the verifiable additional work was $43,438." The arbitrator concluded that when Strata stopped work on the Trio Project on November 19, 2021, OYK owed Strata $68,973, which was based on the amount due on the subcontractor agreements "in accordance with the amounts set forth in those contracts and the percentages complete as agreed upon by both parties in Pay Application 7," the amount that remained due on the five written change orders, "and the additional amount that was owed on unapproved invoices as reconciled with extra work having been performed as indicated in daily reports." With respect to the Avant Project, the arbitrator awarded Strata $12,437 for change order work which had not been included in written change orders.

The subcontractor agreements for the Trio Project all contained provisions that addressed change orders and the resultant issue of compensation. For example, Section 18 of the Building C Footings and Foundations contract provided that OYK "may make written changes to the Work, including additions, deletions, or other revisions to the Work," but that OYK "*is not responsible for payment to [Strata] for any extra or changed work furnished by [Strata] without prior Change Orders . . . issued in writing by [OYK]*." (Emphasis added.) Similarly, the Building B Foundations contract, the Underground Utilities and Grading contract, and the Masonry Wall Footings and Foundation contract all contained provisions which addressed the requirement that changes to the defined scope of work be in writing. For example, Section 4 of the Building B Foundations contract provided, in pertinent part:

> CHANGES: THE GENERAL CONTRACTOR/OWNER reserve the right, without invalidating this subcontract, to order extra work or to make changes by altering, adding to, or deducting from the Work. All change orders shall to be [sic] in writing. . . . *No payment for additional work shall be made or be due except pursuant to written change order signed by THE GENERAL*

*CONTRACTOR/OWNER*. . . . Fees on Extra Work are as follows: 15% for work performed by subcontractor's own forces, and 5% for work performed by sub-subcontracted forces (this amount is in addition to a 15% allowable fee to the sub-subcontractor. [Emphasis added.].

Similarly, the Avant Project subcontractor agreement stated that OYK was not responsible for making payments to Strata for any extra or changed work that Strata performed without a prior written change order from OYK.

The arbitrator, however, found that the parties had waived enforcement of those provisions. Specifically, the arbitrator found that OYK did not timely issue Change Orders to Strata and that the payments for the work performed under the Changes Orders were not timely made. The arbitrator's factual finding that there was a waiver, is not a clear legal error.

## 5. CLAIMS AND DISPUTES CLAUSE: AVANT PROJECT

Next, OYK contends that the arbitrator erred by concluding that Strata was permitted to suspend its performance on the Avant Project while the parties disputed what OYK owed Strata. Specifically, OYK argues that by failing to perform, Strata acted in contravention of the claims and disputes clause of the parties' subcontractor agreement, which requires Strata to keep working in the midst of an ongoing payment dispute. We agree.

In his award, the arbitrator concluded that OYK was "chronically behind" in making its payments to Strata, this continued until November 12, 2021, and the chronic delay, along with the fact that OYK owed Strata $53,490, amounted to a material breach of the parties' subcontractor agreement by OYK. The arbitrator specifically opined that "[t]his, together with the fact that OYK was persistently late in making payments, justified Strata's suspension of work."

Section 20 of the subcontractor agreement addresses claims and disputes. This section provides:

**Claims and Disputes**: Claims by [Strata] for an increase to the Subcontract Sum or Subcontract Time, . . . or otherwise for damages, losses, or payments, must be submitted by [Strata] in writing to [OYK] within seven days of the condition giving rise to the claim[.] . . . If [Strata] fails to provide this required written notice, [Strata] waives and releases any right to the claim, including all damages, losses, costs, or fees arising in any way out of the claim. In the event of a dispute between [OYK] and [Strata] concerning [Strata's] claim, [Strata] agrees to continue performance of its Work during the dispute.

The arbitration award reflects that as of October 31, 2021, Strata had invoiced OYK $527,255 for its work under the Avant Project subcontractor agreement, as well as $12,437 for extra work outside of the established scope of work. Accounting for the withholding of 10% for OYK's retainage, and payments from OYK to Strata of $295,212, OYK owed Strata another $191,755. However, because of payment discrepancies, the arbitrator concluded that as of October 31, 2021, OYK owed Strata $149,164.70. As of November 12, 2021, Strata had invoiced OYK $6,930 and, after OYK made two additional payments totaling $102,604, Strata was owed $53,490. The arbitrator characterized OYK as "chronically late" in making its payments to Strata

throughout the course of the project, and because of the chronic late payments, and the amount outstanding, this was a material breach of the parties' contract justifying Strata's suspension of work.

In making this determination, the arbitrator did not refer to Section 20 of the subcontractor agreement, or otherwise explain his reasoning for stating why OYK had breached the parties' contract. Observing that OYK eventually terminated the agreement, the arbitration characterized OYK's actions as a wrongful termination. Specifically, with regard to the underground detention system, the arbitrator acknowledged that Strata could not continue its work because Strata had "run out of sand backfill before the work was completed." The arbitrator also stated that for Strata to complete the work, it would have had to incur costs to correct and complete the underground detention system.

Section 20 of the subcontractor agreement, in addition to requiring Strata to provide written notice of a dispute of a claim to OYK, provides that if Strata does not do so within seven days of the condition that gave rise to the claim, it will have waived the underlying claim. The claims and dispute provision also states that if a dispute arises between the parties, Strata agrees to continue to perform its work. The facts as set forth in the arbitration award do not indicate that the parties were involved in a dispute regarding damages, a loss, or payment under the subcontract agreement. Instead, the record reflects that OYK had routinely not paid Strata and that, because of this lack of payment, Strata was simply unable to continue with its work. Strata attempts to argue that Section 20 is limited to claims that arise from changed work, but the language of the provision does not support this interpretation. Instead, it addresses claims for increases to the Subcontract Sum or Subcontract Time, "including a claim for an adjustment to a [Construction Change Directive (CCD)], *or otherwise for damages, losses, or payments*." (Emphasis added.)

Therefore, we disagree with Strata's interpretation of Section 20 as being limited to claims for changed work. Section 11 of the parties' agreement specifies that Strata understood that time was of the essence with regard to its performance, and that it was to "strictly comply" with OYK's work schedule, and Section 13 addressing payment does not indicate that Strata may suspend its performance for late payments. Similarly, Section 25, addressing defaults, states that Strata would be held in default for failing to maintain the pace of the schedule of work, including during payment disputes, or not carrying out the work as specified in the subcontract agreement. Yet the arbitrator did not even address these provisions and excused Strata's failure to perform under the subcontract agreement, without providing the authority for his determination. If Strata is held in default, OYK had the option to withhold payments to protect itself, and if the default was not corrected, OYK also had the option to terminate the subcontract agreement for cause.

Accordingly, under the plain and unambiguous terms of the parties' agreement, Strata did not have the ability to suspend its performance because of delayed payments by OYK, and once Strata did suspend its performance, under Section 25 of the subcontractor agreement, it was the party in default. Under circumstances in which the arbitrator did not apply these contractual provisions in his analysis, he erred as a matter of law, and because his decision substantially impacted the outcome, namely with regard to which party breached the subcontractor agreement, the trial court's order affirming the arbitrator's ruling is reversed.

## 6. THE DOCTRINE OF ANTICIPATORY REPUDIATION: THE TRIO PROJECT AND THE AVANT PROJECT

Finally, OYK argues that in refusing to continue its work performance, Strata's actions amounted to an anticipatory repudiation of the subcontractor agreements under Michigan law. We agree in part with regard to the Avant Project subcontractor agreement and disagree concerning the Trio Project subcontractor agreements.

Turning first to the Avant Project, as we have concluded in addressing OYK's argument that Strata contravened the claims and disputes clause of the Avant Project subcontractor agreement by ceasing to perform, the arbitrator erred in not addressing several relevant sections of the parties' agreement. These include Section 20, addressing Strata's responsibilities in the event of a claim or dispute over payment, Section 11 regarding the schedule of performance of the agreement, and Section 13 addressing payment provisions. Additionally, the arbitrator did not address whether Strata acted in default under the subcontractor agreement under Section 25 of the agreement when it ceased performance.

Under the doctrine of anticipatory repudiation, if, before the time a party is expected to perform, that party clearly and unequivocally states its intention not to perform, the innocent party to the agreement retains the option to either sue immediately for breach of contract or wait until the time of performance. *Van Buren Charter Twp*, 319 Mich App at 555. The party that first breached the contract is not permitted to pursue a cause of action against the other contract party for a subsequent breach or failure to perform. *Skaates v Kayser*, 333 Mich App 61, 80; 959 NW2d 33 (2020). In determining if an anticipatory breach has occurred, it is the party's intention, manifested by words and conduct that are dispositive, as opposed to any potential secret intention that they may have had. *Van Buren Charter Twp*, 319 Mich App at 555.

Strata's conduct did not amount to an anticipatory repudiation, because it did not state its intention not to perform before the time it was required to perform. *Id*. Instead, Strata's actions are better legally characterized as a default under the terms of the Avant subcontractor agreement by refusing to perform in accordance with the agreement, and a substantial breach of the parties' agreement under Michigan law. See *Tindle v Legend Health, PLLC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 360861); slip op at 6 (recognizing that a substantial breach of contract will be found under circumstances in which the breach has caused such an alteration in the key and instrumental elements of the agreement that continued performance by the other party is rendered impossible).

By ceasing all performance under the parties' agreement in November 2021 because of outstanding payments from OYK, which the terms of the parties' agreement did not authorize it to do, Strata was in default under the parties' agreement, and therefore not able to pursue a cause of action against OYK for a subsequent alleged breach or failure to perform. *Skaates*, 333 Mich App at 80. By disregarding the provisions of the parties' agreement, the arbitrator was hindered in analyzing whether (1) Strata defaulted under the terms of the subcontractor agreement, or (2) the doctrine of anticipatory breach applied. Therefore, the arbitrator not only failed to address the relevant provisions of the subcontractor agreement, but he did not rule in compliance with controlling principles of Michigan law. Accordingly, these legal errors, which influenced the

arbitrator's ultimate decision regarding which party breached the Avant Project subcontractor agreement, substantially impacted its award and thus warrant reversal in part.

With regard to the Trio Project, addressing first Strata's work on Building C, the arbitrator acknowledged that the PEA Group (PEA), a third-party inspector, was retained by the parties to monitor and test Strata's work on Building C. PEA was also responsible for certifying Strata's work on Building C. Noting that it was "unclear" if there were any deficiencies in Strata's work on Building C, the arbitrator stated that any alleged defective work related to OYK's failure to have PEA present to inspect and certify that the work was done correctly. Accordingly, any delay at the Building C worksite was not Strata's responsibility and any damages that OYK sought to recover were not compensable. The arbitrator stated that while the Building C Footings and Foundations contract required the construction of the foundations at Building C, for work to continue during disputes, the city of Rochester Hills needed to approve PEA's procedures, and its decision not to do so had prevented that foundation work from continuing, as evidenced in OYK's daily reports. Therefore, "[t]here was no work which Strata could have proceeded with on this contract as of the date Strata ceased performing." With respect to the Building C Footings and Foundations contract, PEA could not certify Strata's work under this subcontractor agreement because the city of Rochester Hills would not approve its procedures and protocols, leaving Strata in a position in which it could not move forward with its work. OYK's contention that the arbitrator should have determined that Strata engaged in an anticipatory repudiation of the Building C Foundation and Footings contract is without merit.

The Underground Utilities and Grading subcontractor agreement did not contain a provision which required Strata to continue working even in the event of a payment dispute between the parties. Additionally, the arbitrator noted throughout his December 9, 2022 written opinion that OYK had routinely not issued written change orders to Strata that would have allowed Strata to bill OYK for the changed work that OYK repeatedly asked it to perform. The arbitrator acknowledged that the written change orders were issued "well after the actual time when the work reflected in the enumerated invoices had been performed[,]" and even though OYK did not issue the written change orders to Strata in a timely manner, OYK also failed to advance payment to Strata. It is clear that the arbitrator found that Strata, from a business perspective, could no longer continue working for OYK when it was not being paid for doing so, and under such circumstances, did not consider Strata's decision to pause performance while awaiting payment an anticipatory repudiation. Because this is a factual finding of the arbitrator that is not subject to this Court's review, we are not persuaded that the arbitrator erred in his decision not to apply the doctrine, or that the trial court erred in declining to vacate this portion of the arbitrator's award. *Kilpatrick*, ___ Mich App at ___; slip op at 3.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Kirsten Frank Kelly
/s/ Mark J. Cavanagh
/s/ Michael J. Kelly

-11-